IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| WENDY JO HAYS, | ) CASE NO.  1:20-CV-02243-JG |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) JUDGE JAMES GWIN |
| vs. | ) UNITED STATES DISTRICT JUDGE |
| | ) |
| COMMISSIONER OF SOCIAL | ) MAGISTRATE JUDGE |
| SECURITY, | ) JONATHAN D. GREENBERG |
| | ) |
| Defendant. | ) **REPORT & RECOMMENDATION** |

Plaintiff, Wendy Jo Hays ("Plaintiff" or "Hays"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act,42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In May 2018, Hays filed an application for POD and DIB, alleging a disability onset date of January 2, 2018 and claiming she was disabled due to lupus, migraines, neuropathy, diabetes, myofascial pain syndrome, anxiety, joint pain, fatigue, Raynaud's, and vertigo.  (Transcript ("Tr.") 10, 93, 108.)  The applications were denied initially and upon reconsideration, and Hays requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 10.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On September 27, 2019, an ALJ held a hearing, during which Hays, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On October 21, 2019, the ALJ issued a written decision finding Hays was not disabled.  (*Id.* at 10-27.)  The ALJ's decision became final on August 3, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On October 5, 2020, Hays filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16-17.) Hays asserts the following assignments of error:

> (1)  The ALJ committed harmful error when he failed to conduct a meaningful review of Listing 14.02 regarding Hays' systemic lupus erythematosus.
>
> (2)  The ALJ committed harmful error when he failed to properly consider Hays' subjective symptoms in accordance with Social Security Ruling 16-3p.

(Doc. No. 14.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Hays was born in September 1971 and was 48 years-old at the time of her administrative hearing (Tr. 25), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c). She has at least a high school education and is able to communicate in English.  (Tr. 26.)  She has past relevant work as a user support analyst, billing typist, medical voucher clerk, insurance specialist, customer complaint representative, and accounting clerk.  (*Id*. at 25.)

### B.  Medical Evidence[2]

On May 22, 2015, Hays underwent a consultative psychological evaluation with Mitchell Wax, Ph.D.  (*Id.* at 302.)  Hays reported her medical and mental health problems prevented her from working.

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

(*Id.*)  Hays told Dr. Wax she had lupus flare ups twice a month, neuropathy in her hands and feet, vertigo, and migraine headaches.  (*Id.* at 303.)  Hays reported one hospitalization for medical problems in the past three years.  (*Id.*)  While Hays was on Cymbalta for her physical impairments, she had no previous psychiatric care or counseling.  (*Id.*)  Hays reported going to bed between 11 p.m. and 1 a.m. and waking up between 9:30 and 10 a.m.  (*Id.* at 304.)  She took her medicine when she woke up and rested for an hour to let her medication take effect.  (*Id.*)  She then did household chores for a half hour before resting.  (*Id.*)  She then continued to do chores before making lunch for her 15-year-old.  (*Id.*)  One of her adult children then drove her to the store.  (*Id.*)  When she got home, she rested.  (*Id.*)  She may spend 20 minutes in the afternoon doing yard work.  (*Id.*)  She started dinner around 4 or 5 p.m. and the family ate together at 7 p.m.  (*Id.*)  Hays reported napping three times a week for one to three hours.  (*Id.*)  She told Dr. Wax she was a good cook and cooked full meals.  (*Id.*)  She bathed daily and did laundry weekly. (*Id.*)  She cleaned her house regularly and swept the house weekly when she felt okay.  (*Id.*)  She went grocery shopping with her husband or children twice a month.  (*Id.*)  She reported feeling anxious and getting headaches in stores.  (*Id.*)  Hays told Dr. Wax she read online daily and read the newspaper weekly.  (*Id.*)  She enjoyed graphic arts and photography, and she had three or four friends that she talked to daily.  (*Id.*)

On examination, Dr. Wax found that sometimes Hays' speech was logical, coherent, and goal-directed, although Hays often did not answer questions directly.  (*Id.* at 305.)  Dr. Wax noted Hays' annoyance at the beginning of the evaluation and a sense of entitlement.  (*Id.*)  Hays appeared a little anxious and was "frequently argumentative."  (*Id.*)  Hays showed "frustration and annoyance" towards Dr. Wax when asked questions she did not like.  (*Id.*)  Hays reported crying twice a week, although she did not cry during the evaluation, and reported her anger was better since being on medication.  (*Id.*)  Hays told Dr. Wax she had suicidal thoughts, although she had no plan of hurting herself.  (*Id.*)  Hays appeared

3

"fretful" and complained "frequently about living with chronic pain." (*Id.*)  Hays reported problems with trembling and needed to stand twice during the evaluation because of back pain.  (*Id.*)  Although Hays reported panic attacks 15 times a month, Dr. Wax noted no signs of anxiety during the evaluation.  (*Id.*) Dr. Wax found Hays functioning in the average range of intelligence, although there were signs of mental confusion and she frequently distorted questions and did not answer them directly.  (*Id.*)  Hays' ability to concentrate was intermittent and her flow of conversation and thought was marginal because of her over-involvement with her medical issues.  (*Id.*)  Hays recalled five digits forward and four digits backward, could recall all three simple words after five minutes, and she could add by threes to 40 and subtract sevens from 100.  (*Id.*)  Dr. Wax diagnosed Hays with personality disorder not otherwise specified and panic disorder with agoraphobia.  (*Id.* at 306.)

Dr. Wax opined that Hays would be able to understand, remember, and carry out instructions and thought her difficulty answering questions during the examination may have been a result of her personality disorder.  (*Id.*)  Dr. Wax further opined Hays would have no issue maintaining concentration and attention on a job based upon her ability to hold jobs in the past and do household chores, including cooking full meals.  (*Id.*)  Dr. Wax opined Hays would have difficulty responding appropriately to supervisors and coworkers due to her personality disorder.  (*Id.* at 307.)  However, Hays would respond appropriately to work pressures in a work setting.  (*Id.*)

On January 3, 2018, Hays saw Dr. Marie Kuchynski for follow up regarding her lupus.  (*Id.* at 360.)  Dr. Kuchynski noted Hays had recently been diagnosed with diabetes.  (*Id.*)  After experiencing oral ulcers that could not be controlled topically, Hays underwent a steroid taper the week before and was much better.  (*Id.*)  Hays reported mouth sores, morning stiffness, localized joint pain, myalgias, arthralgias, skin lesions, rash, and fatigue.  (*Id.*)  Hays denied back pain, joint swelling, muscle weakness, photosensitivity, patchy hair loss, nail abnormalities, and easy bleeding and bruising.  (*Id.*)  On

4

examination, Dr. Kuchynski found normal gait, swelling of fingers and wrists, no synovitis of the joints, full range of motion of the joints, neck, and back, normal muscle tone and strength, normal coordination, and mild malar rash.  (*Id.* at 364.)  Dr. Kuchynski noted Hays had recently had a lupus flare with oral ulcers that was improving on a steroid taper.  (*Id.* at 365.)

On June 22, 2018, Hays saw George Ignat, M.D., for her systemic lupus erythematosus ("SLE").  (*Id.* at 487.)  Dr. Ignat noted Hays' SLE appeared partially controlled.  (*Id.*)  Hays complained of arthritis, photosensitivity, mouth sores, rash, and joint pain.  (*Id.* at 488.)  On examination, Dr. Ignat found mild face rash, oral ulcers, normal motor strength, normal sensory exam, normal flexion, extension, and lateral bending of the cervical spine, decreased forward and lateral bending of the lumbar spine, negative straight leg test, tenderness of the lumbar spine, normal shoulder range of motion, shoulder tenderness, no synovitis and normal extension of the elbows, no synovitis and normal range of motion of the wrists, no synovitis of the hand joints, normal range of motion and no tenderness of the hips, knee tenderness but normal alignment and range of motion, ankle pain or swelling but normal range of motion, and no tenderness of the joints in the feet.  (*Id.* at 488-89.)

On June 25, 2018, Hays completed an Adult Function Report.  (*Id.* at 233-41.)  Hays reported becoming exhausted and experiencing more joint pain and migraines because of increased disease activity.  (*Id.* at 233.)  When Hays worked four hours, she would fall asleep at the dinner table.  (*Id.*)  Hays reported napping two to four hours.  (*Id.* at 234.)  Hays helped with her husband and 18-year-old son's laundry and meals about 1/3 of the time.  (*Id.*)  Hays let her dogs in and out, brushed them, played with them, and brushed her cats three times a week.  (*Id.*)  Hays reported having severe joint pain and myofascial pain that kept her up or woke her up at night.  (*Id.*)  She could handle her personal care herself.  (*Id.*)  Her husband reminded her to take her medication.  (*Id.* at 235.)  She could prepare meals, although her husband cooked 1/3 of the time if she was sick or too exhausted.  (*Id.*)  She loaded the dishwasher, did some laundry,

dusted, mopped the floors, and swept the stairs to the house.  (*Id.*)  She did not do yard work because the sun made her sick.  (*Id.* at 236.)  She shopped twice a week.  (*Id.*)  She could pay bills, although she forgot to pay some so her husband handled the finances now.  (*Id.* at 236-37.)  Her hobbies included graphic arts, photography, and scrap booking.  (*Id.* at 237.)  Hays reported she could only lift 20 pounds, she had to alternating walking and sitting every fifteen minutes, she could not kneel, she could walk up to ¾ of a mile but then would be exhausted the next day, and she could pay attention until her pain got too bad.  (*Id.* at 238.)  She could follow written instructions well, somewhat follow spoken instructions, and got along well with authority figures.  (*Id.* at 238-39.)  She could do small tasks with breaks every 20 minutes for about an hour before she got exhausted.  (*Id.* at 241.)

On July 13, 2018, Hays saw Dr. Ignat for follow up.  (*Id.* at 496.)  Dr. Ignat noted Hays was taking variable doses of Prednisone and Imuran and had pain in most of her joints and mouth sores.  (*Id.* at 497.)  Dr. Ignat determined Hays' SLE was not well controlled.  (*Id.*)  On examination, Dr. Ignat found mild face rash, oral ulcers, normal motor strength, normal sensory exam, normal flexion, extension, and lateral bending of the cervical spine, decreased forward and lateral bending of the lumbar spine, negative straight leg test, tenderness of the lumbar spine, normal shoulder range of motion, shoulder tenderness, no synovitis and normal extension of the elbows, no synovitis and normal range of motion of the wrists, no synovitis of the hand joints, normal range of motion and no tenderness of the hips, knee tenderness but normal alignment and range of motion, ankle pain or swelling but normal range of motion, and no tenderness of the joints in the feet.  (*Id.* at 497-98.)

On November 1, 2018, Hays saw Aman Ramella, M.D., to establish care.  (*Id.* at 455.)  Hays complained of occasional palpitations that were sometimes positional.  (*Id.*)  On examination, Dr. Ramella found no significant rashes or lesions, normal oral cavity, normal neurologic examination, normal gait and coordination, normal range of motion, and normal muscle strength and tone.  (*Id.* at 456.)

On November 5, 2018, Hays went to the emergency room visit with a right foot injury after her dogs ran around her, catching her ankle in their chains.  (*Id.* at 430.)  Hays complained of pain, swelling, redness, and bruising.  (*Id.*)  Hays rated her pain as a 9/10.  (*Id.*)  On examination, treatment providers found decreased range of motion, tenderness, swelling, pain with range of motion, pain to palpation, and bruising.  (*Id.* at 432.)  X-rays revealed no evidence of fracture or subluxation.  (*Id.*)  Treatment providers determined Hays had a Lisfranc type injury of the midfoot.  (*Id.* at 432, 442-445.)

On November 8, 2018, Dr. Ignat completed a questionnaire and stated Hays suffered from SLE and migraines.  (*Id.* at 420.)  Hays' symptoms consisted of polyarthritis, photosensitivity, and mouth sores. (*Id.*)

On November 9, 2018, Dr. Ramella completed a questionnaire and stated that while Hays' medication had "been relatively controlling her SLE," she was still having occasional flares every few weeks.  (*Id.* at 452-54.)  Dr. Ramella opined Hays had limitations with prolonged walking, standing, and bending because of recurrent active joint disease and myopathy.  (*Id.* at 453.)  Hays' symptoms included "[m]ultiple areas of joint line tenderness and joint swelling (mild)."  (*Id.* at 454.)

On November 14, 2018, Hays saw a cardiologist for an urgent visit ahead of her foot surgery the following day.  (*Id.* at 465.)  On examination, Hays' cardiologist found deconditioning at 93% of age-predicted target heart rate and no ischemic ECG changes.  (*Id.*)

On November 15, 2018, Hays underwent surgery for her Lisfranc fracture dislocation of the right mid foot.  (*Id.* at 483-85.)

On December 5, 2018, Hays saw Richard Zirm, DPM, for follow up after her foot surgery.  (*Id.* at 480.)  Hays reported her pain was minimal.  (*Id.*)  Hays denied weakness, bone/joint symptoms, leg cramps, edema, Raynaud's, skin lesions, gait abnormality, and tingling/numbness.  (*Id.* at 481.)

On December 21, 2018, Hays saw Dr. Sabino Velloze for a cardiovascular evaluation of her palpitations.  (*Id.* at 514.)  Hays reported having palpitations for some time.  (*Id.*)  Hays explained she usually had palpitations when she woke up.  (*Id.*)  An echocardiogram the month before was essentially normal.  (*Id.*)  Dr. Velloze suspected Hays had "'reactive' tachycardia" and it was most likely in response to some extraneous stimulus rather than a primary cardiac arrythmia.  (*Id.* at 516.)  Dr. Velloze noted her normal echocardiogram and normal stress test.  (*Id.*)  Dr. Velloze ordered a 48-hour Holter monitor.  (*Id.* at 515.)

On January 2, 2019, Hays saw Dr. Zirm for follow up seven weeks after her foot surgery.  (*Id.* at 551.)  Hays rated her pain as a 5/10 and also complained of hip pain.  (*Id.*)

On January 10, 2019, Hays saw Dr. Ignat for follow up.  (*Id.* at 774.)  Dr. Ignat noted Hays' SLE was not better controlled since her Benlysta injection.  (*Id.* at 775.)  Hays reported severe right shoulder and left lateral hip pain.  (*Id.*)  On examination, Dr. Ignat found mild face rash, oral ulcers, normal motor strength, normal sensory exam, normal flexion, extension, and lateral bending of the cervical spine, decreased forward and lateral bending of the lumbar spine, negative straight leg test, tenderness of the lumbar spine, normal shoulder range of motion, shoulder tenderness, no synovitis and normal extension of the elbows, no synovitis and normal range of motion of the wrists, no synovitis of the hand joints, normal range of motion and no tenderness of the hips, knee tenderness but normal alignment and range of motion, ankle pain or swelling but normal range of motion, and no MTP joint tenderness in the feet, although her right foot was in a boot post-surgery.  (*Id.* at 777.)

On January 23, 2019, Hays appeared in a walking boot and was using a cane ten weeks after foot surgery.  (*Id.* at 554.)  On examination, Dr. Zirm found little to no swelling and Hays denied having pain.  (*Id.* at 555.)  There was mild paresthesia over the distal screw.  (*Id.*)  Dr. Zirm noted Hays was doing well,

her screws should be removed in the next two weeks, and Hays was to continue with the walking boot and cane.  (*Id.*)

On February 4, 2019, Hays underwent surgery to remove two of the screws due to a complication of the internal fixation.  (*Id.* at 557.)

On February 15, 2019, Hays saw Dr. Zirm for follow up after removal of the two screws from her foot.  (*Id.* at 562.)  Hays denied weakness, bone/joint symptoms, leg cramps, edema, Raynaud's, skin lesions, gait abnormality, and tingling/numbness.  (*Id.* at 563.)  On examination, Dr. Zirm found mild swelling and mild erythema, but Hays did not have increased pain complaints and overall was doing well. (*Id.* at 562-63.)  Dr. Zirm directed Hays to continue using the cam walker and cane.  (*Id.* at 563.)

On March 12, 2019, Hays saw Brendan Kappus, D.O., for a new patient visit.  (*Id.* at 786.)  Hays reported getting a migraine or dizziness after getting her Benlysta injection.  (*Id.*)  Dr. Kappus noted SLE flares with mouth sores, fatigue, and face rash.  (*Id.*)  Hays was using a cane to walk after foot surgery. (*Id.*)  Hays denied myalgias, muscle weakness, limb swelling, rashes, and cold and heat intolerance.  (*Id.* at 786-87.)  Hays was currently working as a medical assistant.  (*Id.* at 788.)  On examination, Dr. Kappus found no mouth lesions, normal skin color and pigmentation, 5/5 strength, no gait abnormalities, no loss of muscle mass, and normal neurological exam.  (*Id.* at 790.)  Dr. Kappus noted Hays' SLE was stable, and she had no rashes that day.  (*Id.* at 791.)

On April 25, 2019, Hays saw Dr. Ignat for follow up.  (*Id.* at 769.)  Hays complained of bilateral knee and shoulder pain.  (*Id.*)  Dr. Ignat diagnosed subacromial bursitis of the right shoulder joint, trochanteric bursitis of the left hip, and candida infection of the mouth in addition to SLE and migraines. (*Id.*)  Dr. Ignat noted Hays had pain in her most of her joints, mouth sores, and white tongue deposits, and overall, her SLE was not better controlled since Benlysta injections as her CRP and ESR were still elevated.  (*Id.* at 770.)  On examination, Dr. Ignat found mild face rash, oral ulcers, mild white tongue

9

deposits, normal motor strength, normal sensory exam, normal flexion, extension, and lateral bending of the cervical spine, decreased forward and lateral bending of the lumbar spine, negative straight leg test, tenderness of the lumbar spine, normal shoulder range of motion, shoulder tenderness, no synovitis and normal extension of the elbows, no synovitis and normal range of motion of the wrists, no synovitis of the hand joints, normal range of motion and no tenderness of the hips, knee tenderness but normal alignment and range of motion, ankle pain or swelling but normal range of motion, and no MTP joint tenderness in the feet, although her right foot was in a boot post-surgery. (*Id.* at 771-72.)

That same day, Hays went to the emergency room complaining of dizziness. (*Id.* at 613.) Hays reported dizziness, "profound nausea," and neck pain and that she felt like she was going in and out of consciousness. (*Id.*) Treatment providers noted Hays' symptoms had completely resolved. (*Id.* at 620.) Hays was ambulatory with a steady gait. (*Id.*)

On July 25, 2019, Hays saw Dr. Ignat for follow up. (*Id.* at 764.) Hays complained of bilateral knee pain and nausea/vomiting after her Benlysta injection. (*Id.*) Physical examination findings remained the same as Hays' April 25, 2019 visit. (*Id.* at 766-67.)

On August 6, 2019, Dr. Ignat completed a Physical Medical Source Statement. (*Id.* at 507-10.) Dr. Ignat assessed Hays' prognosis as fair. (*Id.* at 507.) Hays' symptoms included joint pain, mouth sores and pain, rash, headache, fatigue, and abnormal range of motion. (*Id.*) Dr. Ignat opined Hays could sit for 60 minutes, stand for 30 minutes, stand/walk for less than two hours, and sit for at least six hours. (*Id.* at 508.) Dr. Ignat further opined Hays would need to walk around for 10 minutes every hour and would need to take a break for fifteen minutes every two hours because of chronic fatigue and pain/paresthesias and numbness. (*Id.*) Hays did not need to use a cane or other hand-held device. (*Id.* at 509.) Hays could occasionally lift and carry 10 pounds, rarely lift and carry 20 pounds, and never lift 50 pounds. (*Id.*) Dr. Ignat opined Hays could use her hands and fingers to perform fine and gross manipulation for 25% of an

10

eight-hour workday and could reach for 10% of an eight-hour workday.  (*Id.*)  Hays would be off-task

20% of the time.  (*Id.*)  Dr. Ignat opined Hays was capable of low stress work, would have good days and

bad days, and would be absent about three days a month.  (*Id.* at 510.)

On September 4, 2019, Hays' husband, David, completed an Adult Function Report.  (*Id.* at 289-

300.)  He reported Hays could not function because of "never ending pain and fatigue that she experiences

on a daily basis."  (*Id.* at 290.)  Hays could function at a higher level if she pushed herself, but if she did,

she got sick and may not function at her normal level for several days.  (*Id.*)  When Hays got up in the

morning, she took care of herself and did light chores around the house.  (*Id.*)  She frequently needed to

nap and usually could not accomplish much.  (*Id.*)  David relayed Hays used to cook but she had not done

so in a very long time.  (*Id.* at 291.)  She could make simple meals that took little time and no prep work.

(*Id.* at 292.)  Hays did laundry once a week and occasionally cleaned.  (*Id.*)  She also did light yard work.

(*Id.*)  If Hays took her time, she could get done what she set out to do.  (*Id.* at 293.)  Hays went shopping

with her husband once a week and it took several hours.  (*Id.* at 293-94.)  Hays visited with her family,

stayed in touch with friends mainly on the computer but sometimes in person, went out to dinner once a

week, and went to the park.  (*Id.* at 295.)  Usually they did not go anywhere, but when they did Hays did

not go 50% of the time.  (*Id.* at 296.)  David opined:

> Wendy has never had a lot of lifting power, but between her illness and her
> weak wrist she had surgery on, she now has almost no strength in her right
> hand.  Walking wasn't much of a problem until she broke her foot last year.
> Since then, her foot swells, depending on the weather and hurts.  Squatting is
> difficult for her because of the pain in her legs and knees.  Kneeling is
> practically impossible for the same reasons as squatting.  Wendy's Memory is
> not very good since she has fallen sick.  She has to be reminded to do simple
> tasks.  She also frequently will tell me things numerous times because she does
> not remember telling me.  Using hands can be a problem, both because of the
> surgery on her right wrist and because of the overall weakness in her arms.  In
> addition to that, if it is cold outside, she also cannot stay out long because of her
> [neuropathy].

(*Id.* at 296-97.)

11

C.    **State Agency Reports**

   1.    **Mental Impairments**

On September 2, 2018, Paul Tangeman, Ph.D., reviewed the file and determined Hays had mild impairments in her abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. (*Id.* at 98.)

On December 21, 2018, on reconsideration, Todd Finnerty, Psy.D., affirmed Dr. Tangeman's findings. (*Id.* at 116-17.)

   2.    **Physical Impairments**

On August 8, 2018, David Knierim, M.D., reviewed the file and opined that Hays could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds, stand and/or walk for more than six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and had an unlimited ability to push/pull other than shown for lift and/or carry. (*Id.* at 101, 103.)  Hays could frequently climb ramps/stairs, but could never climb ladders, ropes, or scaffolds. (*Id.* at 101.)  Her ability to balance, stoop, kneel, crouch, and crawl was unlimited. (*Id.*)  Hays must avoid all exposure to hazards. (*Id.* at 102.)

On December 21, 2018, on reconsideration, Gerald Klyop, M.D., reviewed the file and modified the RFC to reflect that Hays could occasionally stoop, kneel, crouch, and crawl. (*Id.* at 120-21.)  Dr. Klyop affirmed the rest of Dr. Knierim's findings. (*Id.* at 119-21.)

D.    **Hearing Testimony**

During the September 27, 2019 hearing, Hays testified to the following:

- She lives with her husband. (*Id.* at 44.)  Her children are all grown. (*Id.* at 45.)  She has a driver's license and drives once or twice a week to doctor appointments or the store. (*Id.*)  She last worked at the end of 2017. (*Id.* at 46.)

- Her fatigue interferes with her ability to work, even working from home. (*Id.* at 53.)  After working for three hours, she would need to sleep. (*Id.* at 54.)  Some days she

could not do it at all.  (*Id.*)  She never knows if she is going to wake up with a migraine or sick to her stomach.  (*Id.*)  Her fingers become very painful if they get too cold.  (*Id.*)  She cannot move them without an electric feeling going through them. (*Id.*)  If she types, it gets worse.  (*Id.*)  She gets swollen feet.  (*Id.*)  Her physical issues are what prevent her from working.  (*Id.* at 57.)

- She has pain every day, although the location varies.  (*Id.* at 55.)  She has pain in her ankles, knees, hips, shoulders, wrists, and back.  (*Id.*)  Since her foot surgery, her foot hurts every day if she needs to walk.  (*Id.*)  On a typical day, her pain starts as a 4/10 and can go up to a 7/10.  (*Id.*)  Her medication takes her pain back down to a 4/10. (*Id.* at 56.)

- She could sit for an hour and a half and stand for ten minutes.  (*Id.*)  She could comfortably lift five pounds depending on the day.  (*Id.*)

- She does not see anyone for mental health issues.  (*Id.* at 57.)  She has a hard time remembering to take her medications.  (*Id.*)  She has a hard time remembering more recent things.  (*Id.* at 70.)

- She sees her daughter every day.  (*Id.* at 57-58.)  She cares for her dogs, although she rarely takes them for walks and never walks them alone.  (*Id.* at 58.)  She tries to do one task a day around the house.  (*Id.*)  She likes to read and watch videos.  (*Id.*)  She takes pictures with her phone.  (*Id.* at 59.)  She crafts maybe once a week.  (*Id.*)  She keeps up with her friends and family online.  (*Id.*)  Any cooking that involves a long period of time or standing her husband does.  (*Id.* at 59-60.)  She may sort the laundry and put it in the washing machine, and she may fold it or hang it up.  (*Id.* at 60.)  Her husband loads the dryer and carries the laundry upstairs.  (*Id.*)  Her husband usually sweeps the floor.  (*Id.*)  She used to garden, but when she does, she cannot move for two days.  (*Id.* at 61.)  She cannot be outside unless it is late in the evening because the sun makes her sick.  (*Id.*)  She cannot use her hands to cut up food.  (*Id.* at 65.) Her husband and daughter mostly do the grocery shopping.  (*Id.* at 65-66.)  She goes grocery shopping with her husband every two weeks.  (*Id.* at 66.)  She has issues with emptying the dishwasher sometimes.  (*Id.* at 69.)  She avoids shoelaces, buttons, and snaps.  (*Id.*)

- She gets an injection once a week that makes her sick and nauseous for one to three days afterward.  (*Id.* at 61.)  It also wears her out.  (*Id.*)  Her injection causes side effects two-thirds of the time.  (*Id.*)

- Stress, illness, and allergies make her conditions worse.  (*Id.* at 62.)  Taking turmeric and avoiding gluten helps with her symptoms, as does walking, even though it makes her tired.  (*Id.*)  Fluorescent lighting gives her headaches.  (*Id.* at 67.)

- Her lupus flares consist of severe joint pain and the inability to get out of bed.  (*Id.* at 63.)  She gets flares every three months and they last anywhere from two to three days to two weeks.  (*Id.*)  Her doctor prescribes steroids to calm it down.  (*Id.*)  During the

summer, there is only one day a week where she cannot get out of bed.  (*Id.*)  During
the winter, it can be two to three days a week.  (*Id.*)

- She gets palpitations every day.  (*Id.* at 70.)

The VE testified Hays had past work as a user support analyst, filling typist, medical voucher

clerk, insurance specialist, customer service representative, and accounting clerk.  (*Id.* at 72-73.)  The ALJ

then posed the following hypothetical question:

> [A]ssume a hypothetical individual the claimant's age and education and with
> the past six positions that you've identified.  Further assume that the
> hypothetical individual is limited as follows: To light, frequent climbing of
> ramps and stairs.  Never climb ladders, ropes or scaffolds.  Occasional stoop,
> kneel, crouch, crawl.  Never to be exposed to unprotected heights, moving
> mechanical parts, or operate a motor vehicle.  Can that hypothetical individual
> perform any of the past positions that you've identified, as actually performed
> or generally performed in the national economy?

(*Id.* at 74.)

The VE testified the hypothetical individual would be able to perform Hays' past work as a user

support analyst, filling typist, medical voucher clerk, insurance specialist, customer service representative,

and accounting clerk.  (*Id.*)  The VE further testified the hypothetical individual would also be able to

perform other representative jobs in the economy, such as mail clerk, storage facility rental clerk, and

cashier.  (*Id.* at 75.)

The ALJ modified the first hypothetical to occasional right and left foot controls, frequent right

and left hand controls, occasional reaching overhead with the left and right, frequent reaching in all other

directions with the left and right, frequent handling with the left and right, frequent fingering with the left

and the right, occasional climbing of ramps and stairs, occasional balance, stoop, kneel, crouch, and crawl,

never to climb ladders, ropes, or scaffolds, no exposure to unprotected heights, moving mechanical parts,

or operating a motor vehicle, frequent exposure to extreme cold, able to work in, up to, and including a

loud noise environment, limited to performing simple, routine, and repetitive tasks but not at a production

rate pace, *i.e.*, assembly line work, and limited to simple work-related decisions and using her judgment

14

and dealing with changes in the work setting.  (*Id.* at 75.)  The VE testified that would eliminate all past work.  (*Id.* at 76.)  The VE testified the hypothetical individual could perform other representative jobs in the economy, such as mail clerk, electronics worker, and inspector and hand packager.  (*Id.*)

The ALJ modified the second hypothetical to the sedentary level of exertion.  (*Id.* at 76-77.)  The VE testified the hypothetical individual could perform other representative jobs in the economy, such as patcher, touch up screener, and ampoule screener.  (*Id.* at 77.)

The ALJ modified hypothetical number three to occasional left and right handling and occasional left and right fingering.  (*Id.*)  The VE testified there would be no work.  (*Id.* at 78.)

The ALJ asked the VE whether adding a limitation to frequent interaction with supervisors, coworkers, and the public would change the VE's response to hypotheticals two and three.  (*Id.*)  The VE testified that it would not.  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate

that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Hays was insured on her alleged disability onset date, January 2, 2018, and remains insured through December 31, 2022, her date last insured ("DLI"). (*Id.* at 10.) Therefore, in order to be entitled to POD and DIB, Hays must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.  The claimant has not engaged in substantial gainful activity since January 2, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: systemic lupus erythematosus (SLE); post open treatment of tarsometatarsal dislocation of the right foot and screw removal; migraines; polyneuropathy; diabetes; myofascial pain syndrome; Raynaud's syndrome; obesity; anxiety; and posttraumatic stress disorder (PTSD). (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can occasionally operate right and left foot controls; frequently operate right and left hand controls; occasionally reach overhead with right and the left; frequently reach in all other directions with the right and the left; frequently handle with the right and the left; frequently finger with the right and the left; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; frequently be exposed to extreme cold; able to work in (up to and including) a loud noise environment; limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e., assembly-line work); and limited to simple work-related decisions in using her judgment and dealing with changes in the work setting.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born in September **, 1971 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 2, 2018, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12-27.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. First Assignment of Error

In her first assignment of error, Hays argues the ALJ committed harmful error when he failed to conduct a meaningful review of Listing 14.02. (Doc. No. 14 at 1.) Under this assignment of error, Hays raises several arguments unrelated to Listing 14.02, including: (1) the opinions of the state agency reviewing physicians should not have been found persuasive; (2) the ALJ "failed to provide a coherent explanation" for finding Dr. Ramella's opinion "only minimally persuasive"; (3) the ALJ "failed to

19

provide a coherent explanation" for finding Dr. Ignat's opinion unpersuasive; (4) the ALJ erred in not including certain limitations from the opinions of the examining psychologists in the RFC; and (5) the ALJ disregarded contrary evidence. (*Id.* at 16-19.)

The Commissioner responds that the ALJ reasonably determined Hays did not meet or equal Listing 14.02, substantial evidence supports the ALJ's RFC finding, and the ALJ properly evaluated the medical opinion evidence. (Doc. No. 16 at 8-18.)

### 1.     Listing 14.02

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1520(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A claimant is also disabled if her

impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 404.1526(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *Id.* at 416-17.  *See also Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'") (quoting *Reynolds*, 424 F. App'x at 416); *Joseph v. Comm'r of Soc. Sec.*, 741 F. App'x 306, 311 (6th Cir. July 13, 2018) (same)).  *See also Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014) ("Although it is the claimant's burden of proof at Step 3, the ALJ must provide articulation of his Step 3 findings that will permit meaningful review. . . This court has stated that 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'") (quoting *Woodall v. Colvin*, 5:12CV1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013)).

However, "the ALJ's lack of adequate explanation at Step Three can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual manner in another manner."  *Lett*, 2015 WL 853425, at *16.  *See also Ford v. Comm'r of Soc. Sec.*, No. 13-CV-14478, 2015 WL 1119962, at *17 (E.D. Mich. Mar. 11, 2015) (finding that "the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that he or she meets the Listing"); *Mowry v. Comm'r of Soc. Sec.*, No. 1:12-CV-

2313, 2013 WL 6634300, at *8 (N.D. Ohio Dec. 17, 2013); *Hufstetler v. Comm'r of Soc. Sec.*, No.

1:10CV1196, 2011 WL 2461339, at *10 (N.D. Ohio June 17, 2011).

Listing 14.02 defines lupus or "Systemic Lupus Erythematosus ("SLE")" as:

> a chronic inflammatory disease that can affect any organ or body system. It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss). Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis). Immunologically, there is an array of circulating serum auto-antibodies and pro—and anti-coagulant proteins that may occur in a highly variable pattern.

20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00D1.  To satisfy the requirements of Listing 14.02A,

a claimant must have lupus as described above and the following:

> A. Involvement of two or more organs/body systems, with:
>
> > 1. One of the organs/body systems involved to at least a moderate level of severity; and
> >
> > 2. At least two of the constitutional symptoms or signs (severe fatigue, malaise, or involuntary weight loss).

20 CFR Part 404, Subpart P, Appendix 1, Listing 14.02(A).

At Step Three, the ALJ expressly considered whether Hays met or equaled the requirements of

Listing 14.02, as follows:

> Systemic lupus erythematosus (SLE, or lupus) is evaluated under listing 14.02. This listing requires findings that establish that the claimant has criteria described in the classification of SLE, published by the American College of Rheumatology, with:
>
> > A. involvement of two or more organs/body systems with:
> >
> > > 1. one of the organs/body systems involved to at least a moderate level of severity; and

22

2. at least two of the constitutional symptoms or signs found in systemic lupus erythematosus (severe fatigue, fever, malaise, or involuntary weight loss); OR

B. repeated manifestations of SLE with at least two of the constitutional symptoms or signs and one of the following at the marked level:

1. Limitation of activities of daily living.

2. Limitation in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies and concentration, persistence, or pace.

Treatment records show that the claimant is occasionally observed with a mild facial rash, but physical exam does not reveal any synovitis or significant loss of range of motion in her joints. She frequently presents reporting myalgias and fatigue, but there is no mention that lupus is affecting internal organs or other body systems. As discussed in detail below, the claimant does not experience marked limitations in performance of activities of daily living, social functioning, or concentration, persistence, or pace. Therefore, the requirements of this listing are not met.

(Tr. 14-15.)

In his RFC analysis, the ALJ further found as follows:

The claimant also intermittently reports myalgias and arthralgias during her medical appointments as a result of lupus and myofascial pain syndrome. Physical examinations prior to her foot injury describe her as having a normal gait, and generally there are findings of normal movement of all extremities, normal muscle strength and tone, and no synovitis in the elbows, shoulders, hips, knees, ankles, feet and toes. The rheumatologist who saw the claimant notes that she was complaining of joint pain and stiffness, and he found some tenderness in her shoulders, but no synovitis. His records indicate that he diagnosed her with subacromial bursitis of the right shoulder, and trochanteric bursitis of the left hip. (Ex. 2F/6; 3F/7-11; 12F/2-4; 13F/8-9; 20F/7, 12, 18-19).

* * *

At an appointment with her rheumatologist in April 2019, physical examination notes contain findings of a mild face rash, normal flexion and extension of the cervical spine, negative straight leg raising, decreased forward bending and lateral bending of the lumbar spine, and abnormal shoulder movement, with tenderness. There were findings of normal range of motion in the ankles, knees, and no synovitis at the elbows, wrists, or hands. Dr. Ignat noted that she was wearing a boot on her right foot at that appointment. (Ex. 20F/8-10). Dr. Ignat's examination notes from July 2019 show that the claimant was experiencing

23

better control of her lupus on Benlysta injections, but there were still laboratory findings of elevated CRP and ESR, as well as diffuse joint pains. His physical examination findings were the same as those in April 2019. Dr. Ignat has also treated the claimant's shoulder and hip bursitis with injections. (*Id.*, 3-5, 13). There is also mention in the record that the claimant's primary care provider treated knee inflammation due to enthesopathy in January 2017 with an injection. (Ex. 3F/45).

\* \* \*

The treatment records above show that the claimant experiences diffuse and varying muscle and joint pain, with tenderness, and some minor reductions in range of motion in the shoulder joints. Her neurological examinations contain normal findings, and physical examinations consistently mention no synovitis in the hands or other joints. Therefore, these records support the limitation to the sedentary level of exertion, and limitation to occasional reaching overhead with the right and the left arms, and frequent reaching and all other directions, and use of right and left hand controls. The records regarding the claimant's foot fracture and subsequent surgery also support the finding that she can occasionally operate right and left foot controls. These impairments combine to limit the claimant to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, and with her obesity, Raynaud's syndrome and polyneuropathy, lead to the additional findings that she can never climb ladders, ropes, or scaffolds, and never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle.

\* \* \*

The claimant's testimony about the intensity, persistence, and limiting effects of her symptoms are not fully consistent with the evidence of record. The claimant testified that she performs limited household chores, but fatigues quickly. Treatment records do show that she presents with complaints of fatigue and pain when she sees her doctors, but physical examinations are generally unremarkable, with documentation of normal upper and lower extremity strength, intact sensation, no synovitis in the joints of the upper or lower extremities, and no joint effusion. In particular, the claimant alleged severe hand pain; however, physical examinations do not establish significant hand swelling or synovitis. (Ex. 19F/49, 51, 56; 20F/3; 22F/9). At some of her appointments with her physicians, the claimant reports that she is not experiencing joint pain, edema, tingling, numbness, swelling, or symptoms of Raynaud's phenomenon. (Ex. 18F/24; 20F/13-15). This shows that the claimant experiences intermittent and varying symptoms, exacerbated by exertional activities. This supports the limitation to the sedentary level of exertion, with other postural and environmental limitations, but does not support the claimant's allegations of completely incapacitating pain and fatigue.

(*Id.* at 19-20, 22.)

Substantial evidence supports the ALJ's conclusion that Hays does not meet the requirements of Listing 14.02. While the ALJ did not specifically address the severity (or lack thereof) of the symptoms affecting Hays' organs or body systems, it is clear from the ALJ's discussion at Step Three and the ALJ's RFC analysis that the ALJ found Hays' symptoms did not rise to at least a moderate level of severity. The ALJ considered the testimonial, medical, and opinion evidence regarding Hays' impairments, including the evidence on which Hays relies in arguing she meets or equals a listing. (Tr. 18-25.) The ALJ acknowledged Hays' testimony regarding her fatigue, hand pain, and joint pain. (*Id.* at 18, 22.) However, as the ALJ found, the evidence regarding Hays' impairments was mixed. (*Id.* at 18-25.) As of December 21, 2018, the state agency reviewing physician considered the applicability of the listings, including Listing 14.02, and did not find any listing to be met or equaled. (*Id.* at 117, 121.) While Hays argues "much of the evidence from the treating rheumatologist was not in the record" at the time of the state agency reviewing physicians' file review, the ALJ considered the record evidence post-dating the state agency sources' review. *Ealy*, 594 F.3d at 513-14 ("Even if Dr. Hernandez' RFC was completed without knowledge of these issues, however, the record reflects that the ALJ considered them."); *Minyard v. Berryhill*, No. 5:17CV2261, 2019 WL 1099552, at *5 (N.D. Ohio Mar. 8, 2019) ("Further, it is clear from the ALJ's discussion of the evidence in the decision that it was known that medical evidence existed that post-dated the opinion evidence and that the ALJ considered the opinion evidence with that evidence in mind.").

While Hays points to treatment records in support of her argument, she does not identify any medical sources who opined that she met all the criteria of Listing 14.02(A). "By merely pointing to evidence that could support a favorable determination, [Hays] is essentially asking this Court to reweigh the evidence and issue a *de novo* determination." *Vidot v. Colvin*, Case No. 1:14 CV 1343, 2015 WL 3824360, at *8 (N.D. Ohio June 18, 2015). The Court declines to do so. It is the ALJ who "'has the

power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record.'" *Elliott v. Comm'r of Soc. Sec.*, No. 5:17 CV 2140, 2019 WL 400537, at *12 (N.D. Ohio Jan. 31, 2019) (citing *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800-01 (6th Cir. 2004)) (additional citation omitted).  It is not for this Court to reweigh the evidence on judicial review.

Even if there is evidence that supports Hays' argument, the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *See Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90.  Rather, as noted above, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts." *Felisky*, 35 F.3d at 1035.  "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility." *Postell v. Comm'r of Soc. Sec.*, No. 16-13645, 2018 WL 1477128, at *10 (E.D. Mich. Mar. 1, 2018), *report and recommendation adopted by* 2018 WL 1471445 (E.D. Mich. Mar. 26, 2018).  Here, the ALJ's Step Three findings that Hays did not meet or equal the requirements of Listing 14.02 is within that "zone of choice" and thus supported by substantial evidence.

### 2.    Medical Opinion Evidence

Since Hays' claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 404.1520c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the

26

factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1); 416.920c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

### a.  State Agency Reviewing Physicians

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. § 404.1520c(a). With respect to the state agency reviewing physicians' opinions, the ALJ found their opinions "well-supported by the evidence that was available to each at the time of their determinations." (Tr. 22.) However, the ALJ found additional limitations were needed because of more recent evidence regarding Hays' shoulder impairment and foot surgery. (*Id.*) As explained above, the ALJ considered the record evidence post-dating the state agency sources' review. *Ealy*, 594 F.3d at 513-14 ("Even if Dr. Hernandez' RFC was completed without knowledge of these issues, however, the record reflects that the ALJ considered them."); *Minyard v.*

*Berryhill*, No. 5:17CV2261, 2019 WL 1099552, at *5 (N.D. Ohio Mar. 8, 2019) ("Further, it is clear from the ALJ's discussion of the evidence in the decision that it was known that medical evidence existed that post-dated the opinion evidence and that the ALJ considered the opinion evidence with that evidence in mind.").

### b.  Dr. Ramella

The ALJ considered the opinion of Dr. Ramella that Hays had limitations on prolonged standing and walking.  (Tr. 23.)  The ALJ found Dr. Ramella's opinion "minimally persuasive" because Dr. Ramella completed the form after examining Hays one time.  (*Id.*)  However, the ALJ noted he considered the evidence from Dr. Ramella's examination in making his RFC findings.  (*Id.*)  As the ALJ limited Hays to sedentary work, any limitations with prolonged walking and standing would be eliminated by the RFC.

### c.  Dr. Ignat

The ALJ analyzed Dr. Ignat's opinions as follows:

> The rheumatologist who treated the claimant, Gheorghe Ignat, M.D, responded to a request from the Disability Determination Services state agency on November 8, 2018, and confirmed that he was treating her for SLE and migraine. He said that these diagnoses presented with symptoms including polyarthritis and photosensitivity, citing his physical examinations as support. He indicated that it was "too early to say" what her response to treatment was. (Ex. 7F/2-4).

> On August 6, 2019, Dr. Ignat provided another opinion regarding the claimant's functioning on a form entitled "Physical Medical Source Statement." Dr. Ignat opined that the claimant can sit for up to one hour at a time, and stand for 30 minutes at a time before needing to change position, and can stand and walk less than two hours during an eight hour workday. He opined that the claimant would need to take unscheduled breaks during the working day due to chronic fatigue and pain. He said that the claimant does not need to use a cane or assistive device. As for her lifting tolerances, he said that the claimant can occasionally lift 10 pounds or less, and has significant limitations with reaching, handling and fingering. He estimated that she would be able to use her hands for grasping, turning, twisting, and for fine manipulations for 25% of the workday, and could use her arms to reach in front or overhead up to 10% of the workday. He estimated that she would be capable of low stress work, and believe that she would miss approximately three days per month due to her impairments or treatment. (Ex. 15F/2-4).

29

> Dr. Ignat's first statement is not specific, and does not provide any opinion regarding her functional limitations; therefore, it is wholly unpersuasive. His second opinion statement is much more detailed, but is not persuasive, as the degree of limitation he suggests is not supported by his own treatment notes, nor those of other physicians who have examined and treated the claimant. Dr. Ignat's own examinations document no synovitis in the hands, and normal motor strength. They do not mention functional limitations arising from effects of her impairments on the claimant's hands. (Ex. 20F/15).

(*Id.* at 23.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.  20 C.F.R. § 404.1520c(a).  Regarding Dr. Ignat's first opinion, an ALJ may assign less weight to an opinion for vagueness.  *Ackles*, 470 F. Supp. 3d at 747 (citations omitted).  With respect to Dr. Ignat's second opinion, the ALJ found it inconsistent with, and unsupported by, medical evidence in the record, citing specific evidence in support.  (Tr. 23.)

It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here.  While Hays would weigh the evidence differently, it is not for the Court to do so on appeal.

### d.    Examining Psychologists

Hays argues the ALJ erred in failing to incorporate certain limitations from the opinions of examining psychologists Dr. Wax and Mr. Davis in the RFC.  (Doc. No. 14 at 19.)  With respect to Dr. Wax's opinion, Hays asserts he noted Hays had difficulty answering questions and would have difficulty responding appropriately to supervisors and coworkers.  (*Id.*)  With respect to Mr. Davis' opinion, Hays asserts he noted Hays could not remember some words after five minutes and had trouble getting along with others.  (*Id.*)  Hays argues the ALJ erred in failing to include these limitations in the RFC and maintains this matter must be remanded for the ALJ to consider all of the restrictions opined by Dr. Wax and Mr. Davis.  (*Id.*)

The ALJ analyzed the opinions of Dr. Wax and Mr. Davis as follows:

> Based on his psychological consultative examination of the claimant, Dr. Mitchell Wax opined that the claimant would be able to understand, remember,

30

and carry out instructions on a job, maintain attention and concentration, and respond appropriately to work pressures. However, he believed that she would have difficulty responding appropriately to supervisors and coworkers due to her mental impairments. He supported this opinion by saying that the claimant had difficulty responding appropriately to him as an examiner and displayed annoyance in response to his probing questions. (Ex. 1F/7).

Dr. Wax's opinion is only partially persuasive, because he examined the claimant well before her alleged onset date in the current claim. The undersigned considered it only to the extent that it was consistent with the more recent psychological consultative examination and other evidence of record.

* * *

Based on his psychological consultative examination of the claimant, Richard N. Davis, MA opined that the claimant is unlimited in her ability to understand, remember, and carry out instructions, and pay attention and concentrate to follow through on tasks. He reported that the claimant denied having difficulty getting along with people in positions of authority and coworkers, or having difficulty dealing with stress and pressure when she was employed. (Ex. 5F/5).

Mr. Davis' opinion is somewhat persuasive. He relied on the claimant's reports of her past work functioning to opine regarding her ability to interact with others and deal with stress, but his conclusions are well-supported by the documentation of his examination of the claimant, and are consistent with the other evidence of record.

(Tr. 24.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.  20 C.F.R. § 404.1520c(a).  The ALJ addressed both of these factors in weighing the opinions of Dr. Wax and Mr. Davis.  With respect to Mr. Davis' opinion, Hays misreads his opinion in arguing that Mr. Davis opined she had trouble getting along with others.  As the ALJ correctly cites in his RFC analysis, Mr. Davis found that Hays "did not indicate that she had trouble getting along with people in positions of authority nor with co-workers when she was capable of being employed."  (Tr. 407.)

It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here.  While Hays would weigh the evidence differently, it is not for the Court to do so on appeal.

31

### 3.    RFC Analysis

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1).   A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.   *See* 20 C.F.R. § 404.1527(d)(2).   An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(3).   As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.   *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).   *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).   While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.   *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered*.  See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of

evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

With respect to the treatment records, while Hays points to medical evidence she believes supports a more restrictive RFC, the evidence is mixed, and the ALJ credited the medical evidence that supported the RFC.  Hays makes no argument that the ALJ ignored or overlooked contrary lines of evidence in the record.  (Doc. No. 14.)  It is the ALJ's responsibility to resolve conflicts in the evidence, and it is not for the Court to reweigh the evidence.  While the Court acknowledges there is evidence in the record that supports Hays' argument, the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *See Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90.

For all of the foregoing reasons, the undersigned recommends the Court find no error in the ALJ's Step Three or RFC analysis.

## B.    Second Assignment of Error

In her second assignment of error, Hays asserts the ALJ erred when he failed to "properly evaluate the medical evidence and make a defensible determination as to whether Hays' testimony was credible." (Doc. No. 14 at 21.)  Hays further argues the ALJ "committed harmful and reversible error when he summarily dismissed the detailed report from Hays's husband," which Hays maintains "should have been considered in conjunction with the Function Report she completed and her testimony at the hearing."  (*Id.* at 22.)  Hays asserts the ALJ failed to consider her disabling pain "and the fact that it would likely result in her inability to sustain and/or maintain attention and concentration along with affecting her stamina." (*Id.* at 23.)  Hays also argues the ALJ "failed to even mention the evidence which supported Hays' credibility" regarding her symptoms.  (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's evaluation of Hays' subjective symptoms.  (Doc. No. 16 at 18.)  With respect to the Function Report completed by Mr. Hays, the Commissioner argues the ALJ was not required to articulate how he considered evidence from non-medical sources using the same requirements for evaluating prior administration findings or medical opinions.  (*Id.* at 17) (citing 20 C.F.R. § 404.1520c(d)).

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how

[those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[5] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[6] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should

---

[5] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the September 27, 2019 hearing.

[6] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

consider.[7]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Hays' testimony and other statements regarding her symptoms and limitations.  (Tr. 18-19, 22.)  The ALJ determined Hays' medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.* at 18.)  However, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision. (*Id.*)  Specifically, the ALJ found as follows:

> The treatment records above show that the claimant experiences diffuse and varying muscle and joint pain, with tenderness, and some minor reductions in range of motion in the shoulder joints. Her neurological examinations contain normal findings, and physical examinations consistently mention no synovitis in the hands or other joints. Therefore, these records support the limitation to the sedentary level of exertion, and limitation to occasional reaching overhead with the right and the left arms, and frequent reaching and all other directions, and use of right and left hand controls. The records regarding the claimant's foot fracture and subsequent surgery also support the finding that she can occasionally operate right and left foot controls. These impairments combine to limit the claimant to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, and with her obesity, Raynaud's syndrome and polyneuropathy, lead to the additional findings that she can never climb ladders, ropes, or scaffolds, and never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle.
>
> *  *  *

---

[7] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

The claimant's testimony about the intensity, persistence, and limiting effects of her symptoms are not fully consistent with the evidence of record. The claimant testified that she performs limited household chores, but fatigues quickly. Treatment records do show that she presents with complaints of fatigue and pain when she sees her doctors, but physical examinations are generally unremarkable, with documentation of normal upper and lower extremity strength, intact sensation, no synovitis in the joints of the upper or lower extremities, and no joint effusion. In particular, the claimant alleged severe hand pain; however, physical examinations do not establish significant hand swelling or synovitis. (Ex. 19F/49, 51, 56; 20F/3; 22F/9). At some of her appointments with her physicians, the claimant reports that she is not experiencing joint pain, edema, tingling, numbness, swelling, or symptoms of Raynaud's phenomenon. (Ex. 18F/24; 20F/13-15). This shows that the claimant experiences intermittent and varying symptoms, exacerbated by exertional activities. This supports the limitation to the sedentary level of exertion, with other postural and environmental limitations, but does not support the claimant's allegations of completely incapacitating pain and fatigue.

(Tr. 20, 22.)

The Court finds substantial evidence supports the ALJ's assessment of Hays' subjective complaints. The record evidence, as noted by the ALJ, is not entirely consistent with Hays' allegations of disabling conditions. (*Id.* at 18-25.)  Contrary to Hays' allegations, the ALJ credited some of Hays' subjective symptoms but did not accept them to the extent alleged by Hays because of findings on examinations and her daily activities, factors to be considered under the regulations. (*Id.*)  Furthermore, the ALJ's extensive discussion of the relevant medical evidence included several findings that undercut a finding of disability. (*Id.*)

The Commissioner is correct that under 20 C.F.R. § 404.1520c(d), the ALJ was not required to articulate how he considered Mr. Hays' opinion in the Adult Function Report Mr. Hays completed using the factors in 20 C.F.R. § 404.1520c(a)-(c).  Furthermore, the ALJ found as follows regarding Mr. Hays' Adult Function Report:

On September 4, 2019, the claimant's husband, David Hayes, provided a typewritten Third-Party Function Report (Form SSA-3380-BK). He described the claimant's daily activities and provided his opinion regarding how she is affected by her impairments. He said that she uses crutches and a cane. He indicated that her impairments affect almost all exertional activities, and have

37

affected her memory.  He reported that exertion results in fatigue, and that the claimant naps frequently. (Ex. 17E/1-12). Although the undersigned considered the highly detailed report that the claimant's husband provided, his report was not evaluated as opinion evidence. Mr.

Hayes is not a medical professional; therefore, his opinion regarding his wife's symptoms is neither valuable nor persuasive, because he is not qualified to determine whether her impairments result in the behavior and limitations he describes in his statement.

(Tr. 23.)  Again, it is not for the Court to reweigh the evidence on judicial review.

The ALJ referenced Hays' allegations and then contrasted them with the medical evidence, including examination findings, as well as the opinion evidence.  (Tr. 18-25.)  Reading the decision as a whole, it is clear why the ALJ did not accept the entirety of Hays' allegations.  *See* SSR 16-3p, 2016 WL 1119029 (the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").  The Court is able to trace the path of the ALJ's reasoning regarding the ALJ's subjective symptom analysis.

Therefore, the undersigned recommends the Court find there is no error in the ALJ's subjective symptom analysis.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Dated: November 1, 2021                               *s/ Jonathan Greenberg*
                                                      Jonathan D. Greenberg
                                                      United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).